15-15428

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**BARRY BAUER, et al.,**

                         Plaintiffs and Appellants,

**v.**

**KAMALA HARRIS, in her official capacity as Attorney General of the State of California, et al.,**

              Defendants and Appellees.

On Appeal from the United States District Court
for the Eastern District of California

No. 1:11-cv-01440-LJO-MJS
Hon. Lawrence J. O'Neill, Judge

**APPELLEES' ANSWERING BRIEF**

KAMALA D. HARRIS
Attorney General of California
DOUGLAS J. WOODS
Senior Assistant Attorney General
STEPAN A. HAYTAYAN
Supervising Deputy Attorney General

ANTHONY R. HAKL
Deputy Attorney General
State Bar No. 197335
1300 I Street, Suite 125
P.O. Box 944255
Sacramento, CA 94244-2550
Telephone: (916) 322-9041
Fax: (916) 324-8835
Email: Anthony.Hakl@doj.ca.gov
*Attorneys for Defendants-Appellees*

# TABLE OF CONTENTS

**Page**

Introduction ................................................................................... 1

Jurisdictional Statement ................................................................. 2

Statement of Issues ........................................................................ 3

Statement of the Case .................................................................... 4

    I.     California Firearms Laws ........................................................ 4

          A.     Dealer's Record of Sale Transactions and Related Fees .................................................................. 4

          B.     California's Armed Prohibited Persons System ............. 7

          C.     California Senate Bill 819 ............................................. 9

          D.     California Senate Bill 140 ........................................... 11

    II.    Procedural History ................................................................ 13

          A.     Plaintiffs File Suit Challenging Defendants' Expenditure of DROS Fee Revenues. ........................... 13

          B.     The Parties ................................................................. 13

              1.     Defendants ........................................................ 13

              2.     Plaintiffs ........................................................... 14

          C.     Plaintiffs' Claim ........................................................ 15

          D.     The District Court Grants Defendants' Motion for Summary Judgment, Rejecting Plaintiffs' Second Amendment Claim ....................................................... 17

Summary of the Argument ........................................................... 19

Standard of Review ...................................................................... 19

Argument ...................................................................................... 20

    I.     Defendants' Use of DROS Fee Revenues to Fund the APPS Program Does Not Violate the Second Amendment ....................................................................... 20

**TABLE OF CONTENTS**
**(continued)**

A.    The Second Amendment and the Supreme Court's Decisions in *Heller* and *McDonald* .............................. 20

B.    The Two-Step Inquiry Applicable to Second Amendment Challenges in the Ninth Circuit ............... 23

    1.    Step One: There Is No Burden on Plaintiffs' Second Amendment Rights. ............................... 25

    2.    Step Two: The DROS Fee Survives Constitutional Scrutiny ...................................... 27

        a.    Intermediate Scrutiny Applies ................. 27

        b.    The Expenditure of DROS Fee Revenues on the APPS Program Reasonably Advances Important Public Interests ......................................... 29

II.    Defendants' Use of DROS Fee Revenues to Fund the APPS Program is Also Constitutional Under the Applicable "Fee Jurisprudence" ............................................. 33

Conclusion .................................................................................. 41

Statement of Related Cases .......................................................... 42

# TABLE OF AUTHORITIES

**Page**

C<small>ASES</small>

*Adcock v. Chrysler Corp.*
166 F.3d 1290 (9th Cir. 1999) .................................................. 19

*Children's Hosp. Med. Ctr. v. California Nurses Ass'n*
283 F.3d 1188 (9th Cir. 2002) ................................................. 19

*Cox v. New Hampshire*
312 U.S. 569 (1941).......................................................... *passim*

*Fyock v. Sunnyvale*
779 F.3d 991 (9th Cir. 2015) .................................................. 28

*Heller v. District of Columbia*
698 F. Supp. 2d 179 (D.D.C. 2010)................................... *passim*

*Jackson v. City & Cnty of San Francisco*
746 F.3d 953 (9th Cir. 2014) ................................. 1, 17, 24, 29

*Jones v. Lodge at Torrey Pines Partnership*
42 Cal. 4th 1158 (2008) .......................................................... 10

*Justice v. Town of Cicero*
827 F. Supp. 2d 835 (N.D. Ill. 2011).......................... 36, 37, 40

*Kwong v. Bloomberg*
723 F.3d 160 (2d Cir. 2013) ................................. 26, 29, 36, 40

*Louis v. McCormick & Schmick Restaurant Corp.*
460 F. Supp. 2d 1153 (C.D. Cal. 2006)......................................9

*McDonald v. City of Chicago*
561 U.S. 742 (2010)............................................ 20, 22, 23, 36

*Murdock v. Pennsylvania*
319 U.S. 105 (1943)............................................ 34, 35, 38, 39

# TABLE OF AUTHORITIES
## (continued)

Page

*Nat'l Awareness Foundation v. Abrams*
  50 F.3d 1159 (2d Cir. 1995) ................................................... 35

*Ne. Ohio Coal. for the Homeless v. City of Cleveland*
  105 F.3d 1107 (6th Cir. 1997) ................................................ 35

*Southern Oregon Barter Fair v. Jackson County, Oregon*
  372 F.3d 1128 (9th Cir. 2004) ............................................... 35

*Souvannarath v. Hadden*
  95 Cal. App. 4th 1115 (2002) ................................................ 10

*Stonewall Union v. City of Columbus*
  931 F.2d 1130 (6th Cir. 1991) ............................................... 36

*Turner Broad. Sys., Inc. v. FCC*
  520 U.S. 180 (1997) ........................................................... 32

*United States v. Chester*
  628 F.3d 673 (4th Cir. 2010) ................................................ 24

*United States v. Chovan*
  735 F.3d 1127 (9th Cir. 2013) ........................................ *passim*

*United States v. Marzzarella*
  614 F.3d 85 (3d Cir. 2010) .................................................. 23

*United States v. Skoien*
  614 F.3d 638 (7th Cir. 2010) ................................................ 30

*United States v. Vongxay*
  594 F.3d 1111 (9th Cir. 2010) .............................................. 25

*Van Horn v. Watson*
  45 Cal. 4th 322 (2008) ....................................................... 10

# TABLE OF AUTHORITIES
## (continued)

Page

STATUTES

28 U.S.C. § 1291 ................................................................................3

28 U.S.C. § 1331 ................................................................................2

42 U.S.C. § 1983 .............................................................................. 13

Penal Code

§ 11106 ............................................................................................ 4, 5

§ 16580 .......................................................................................... 30, 38

§ 23690 ...............................................................................................5

§ 26500 ...............................................................................................4

§ 26815 ...............................................................................................4

§ 28100 ...............................................................................................4

§ 28155 ...............................................................................................4

§ 28160 ...............................................................................................4

§ 28205 ...............................................................................................4

§ 28220 ...............................................................................................4

§ 28225 ............................................................................................ 3, 5

§ 28225(a) ..........................................................................................5

§ 28225(b)(1) .................................................................................... 11

§ 28225(b)(1)–(10) ........................................................................... 40

§ 28225(b)(2) .................................................................................... 11

§ 28225(b)(3)–(9) ............................................................................. 11

§ 28225(b)(10) .................................................................................. 11

§ 28225(b)(11) ......................................................................... *passim*

§ 28230 .......................................................................................... 5, 40

§ 28235 ....................................................................................... 5, 6, 7

§ 28240 ...............................................................................................5

§ 28240(a) ..........................................................................................6

§ 28240(b) ..........................................................................................6

§ 28300 ...............................................................................................5

§ 28460 ...............................................................................................6

§ 29510 ...............................................................................................6

§ 30000 ...............................................................................................7

§§ 30000–30015 .............................................................................. 31

§ 30000(a) ..........................................................................................7

§ 30000(b) ..........................................................................................8

§ 30005 ...............................................................................................7

§ 30010 ...............................................................................................8

§ 30015 .............................................................................................. 12

§ 30015(a) ............................................................................... 12
§ 30900 ....................................................................................6
§ 30905 ....................................................................................6
§ 33860 ....................................................................................6

## CONSTITUTIONAL PROVISIONS

United States Constitution, Amendment II.................................... 20

## COURT RULES

Federal Rule of Civil Procedure,
   Rule 56(c) ........................................................................ 19

Federal Rules of Appellate Procedure,
   Rule 4(a)(1)(A) ...................................................................3

Federal Rules of Evidence,
   Rule 201 ..............................................................................9

## OTHER AUTHORITIES

California Code of Regulations
   § 28225, Title 11, § 4001............................................... *passim*

**INTRODUCTION**

Plaintiffs are a group of individuals and organizations promoting the right to keep and bear arms. They claim that the Second Amendment prohibits the California Department of Justice (DOJ) from expending the revenues of a $19 firearms transaction fee on California's Armed Prohibited Persons System (APPS) program. APPS, administered by DOJ, is a critically-important program that each year recovers thousands of firearms from persons prohibited from possessing them due to criminal behavior, restraining orders, or mental illness.

The district court rejected Plaintiffs' claim, correctly concluding that the fee at issue – the Dealer's Record of Sale (DROS) fee – does not burden conduct protected by the Second Amendment under the two-step approach applicable to Second Amendment cases in the Ninth Circuit. *See United States v. Chovan*, 735 F.3d 1127, 1136 (9th Cir. 2013); *Jackson v. City & Cnty of San Francisco*, 746 F.3d 953, 960 (9th Cir. 2014). And even if the Second Amendment is implicated, Defendants' use of DROS fee revenues would survive intermediate scrutiny because there is a reasonable fit between the relevant statute and the important public interests of improving public safety by disarming individuals who are prohibited from owning or

possessing firearms due to their criminal history, a restraining order, or mental illness.

Finally, even if this Court were to analyze this case according to the "fee jurisprudence" principles developed in First Amendment cases – which the district court reasonably declined to do – there would be no constitutional violation. The Constitution permits California to charge a fee in connection with the exercise of a constitutional right and use the resulting revenues more broadly than Plaintiffs contend, including to cover the costs of policing and maintaining the public order in connection with the activities in question, which in this case are regulatory and enforcement activities related to the sale, purchase, possession, loan, or transfer of firearms.

For these reasons, and as explained in detail below, this Court should affirm the judgment of the district court.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1331. On March 2, 2015, the court granted Defendants' motion for summary judgment on Plaintiffs' Second Amendment claim, and denied Plaintiffs' motion for summary judgment. Excerpts of Record (ER) 001–009. In its Order, the court upheld the constitutionality of Defendants' use of DROS fee revenues to fund the APPS program. *Id*. On the same day, the

court entered judgment in favor of Defendants. ER014. Plaintiffs appealed. ER010; *see* Fed. R. App. P. 4(a)(1)(A). This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1. Whether Defendants' expenditure of the revenue generated from the $19 DROS fee on the APPS program burdens any conduct protected by the Second Amendment.

2. If so, whether Defendants' use of DROS fee revenues on the APPS program reasonably advances the important public interests of improving public safety by disarming individuals who are prohibited from owning or possessing firearms because of their criminal history, a restraining order, or mental illness.

3. Under the Supreme Court's "fee jurisprudence," whether the $19 DROS fee is designed to meet the expense incident to the administration of California Penal Code section 28225 and to the maintenance of public order in firearms-related regulatory and enforcement activities related to the sale, purchase, possession, loan, or transfer of firearms.

# STATEMENT OF THE CASE

## I.  CALIFORNIA FIREARMS LAWS

### A.  Dealer's Record of Sale Transactions and Related Fees

When an individual purchases a firearm in California, state law generally requires that the individual make the purchase through a licensed California firearms dealer.  Cal. Penal Code § 26500.[1]  State law also requires that the purchaser provide certain personal information on a Dealer's Record of Sale document that the firearms dealer submits to the California Department of Justice.  *See* §§ 28100, 28155, 28160 & 28205.

California law requires a mandatory 10-day waiting period before the firearms dealer can deliver the firearm to the purchaser.  § 26815.  During the waiting period, DOJ conducts a firearms eligibility background check to ensure the purchaser is not legally prohibited from possessing firearms.  § 28220.  DOJ retains information regarding the sale or transfer of the firearm in the Automated Firearms System (AFS), a database maintained by DOJ.  § 11106.  Generally speaking, AFS contains information about registered firearms, such as information regarding the person who owns a particular firearm and whether the firearm is lost, stolen, found, under

---

[1] All further statutory citations are to the California Penal Code unless otherwise indicated.

4

observation, destroyed, retained for official use, or held in evidence while a case is pending.  § 11106.

In general, an individual purchasing a firearm from a licensed dealer must pay $25 in fees.  The majority of that sum consists of a statutory $19 DROS fee intended to reimburse DOJ for specified costs, which are discussed further below.  *See* § 28225, Cal. Code. Regs. Tit. 11, § 4001; *see also* §§ 28230, 28235 & 28240.  This $19 fee is at the heart of this case.[2]

The Legislature first set the DROS fee at $14 by statute in 1995.  *See* SB 670, ch. 901, 1995, § 1.  It remained that amount for about a decade.  In 2004, DOJ adopted regulations adjusting the fee based on the California Consumer Price Index, as permitted by the relevant statute.  § 28225(a) ("The Department of Justice may require the dealer to charge each firearm purchaser a fee not to exceed fourteen dollars ($14), except that the fee may be increased at a rate not to exceed any increase in the California Consumer Price Index as compiled and reported by the Department of Industrial Relations.").  The current $19 fee is reflected in a regulation that reads as follows:  "As authorized pursuant to sections 28225, 28230 and subdivisions

---

[2] The other fees included in the $25 figure, but not at issue in this case, are a $1 fee that is deposited in the Firearms Safety Account, *see* § 23690, and a $5 fee that is deposited into the Firearms Safety and Enforcement Fund, *see* § 28300.

(a) and (b) of section 28240 of the Penal Code, the [DROS] fee is $19 for one or more firearms (handguns, rifles, shotguns) transferred at the same time to the same transferee."  Cal. Code. Regs. tit. 11, § 4001.

Without the 2004 fee adjustment, the Dealer's Record of Sale Special Account was projected to run out of cash to support the former Division of Firearms' (now Bureau) regulatory and enforcement programs. Supplemental Excerpts of Record (SER) 002.   The Dealer's Record of Sale Special Account is the name of the state fund created by the Legislature into which all DROS fees collected as a result of firearms transactions are deposited.  § 28235 ("[a]ll moneys received by the department pursuant to this article shall be deposited in the Dealer's Record of Sale Special Account of the General Fund, which is hereby created").  By law, a number of other state firearms fees are deposited into the same account.[3]

Typical of any state fund, money in the DROS Special Account remains there unless the Legislature appropriates some or all of it out of the

_____

[3] *See, e.g.*, § 28460 ($115 annual fee to cover costs of maintaining centralized list of exempted federal firearms licensees); § 29510 ($104 entertainment firearms permit program fee); § 30900 ($20 fee for registering assault weapon); § 30905 ($25 fee for registering .50 BMG rifle); § 33860 ($20 fee for processing requests to return firearms).

fund. *See* § 28235 (moneys available "upon appropriation by the Legislature").

## B. California's Armed Prohibited Persons System

The California Legislature established the Armed Prohibited Persons System in 2001. § 30000. That legislation established an electronic system within DOJ to cross-reference AFS (which is part of the Consolidated Firearms Information System (CFIS)) with databases containing records regarding persons prohibited from owning firearms and produce a list of armed prohibited persons. *Id*. In general, prohibited persons are those who have been convicted of a felony or a violent misdemeanor, are subject to a domestic violence restraining order, or have been involuntarily committed for mental health care. § 30005.

On a daily basis, the APPS system reconciles AFS – the database containing sales information retained by DOJ as a result of the DROS process – against databases housing California's criminal history, domestic violence restraining orders, wanted persons, and the On-Line Mental Health Firearms Prohibition Reporting System. *See* § 30000(a); ER321. The system produces a list of armed prohibited persons, and DOJ staff check the list for accuracy. ER322–323 & 333. Law enforcement officers throughout California can access the APPS list 24 hours a day, 7 days a week, through

the California Law Enforcement Telecommunications System (CLETS).

*See* § 30000(b); *see also* § 30010 ("The Attorney General shall provide investigative assistance to local law enforcement agencies to better ensure the investigation of individuals who are armed and prohibited from possessing a firearm.")  As of January 15, 2015, there were 17,791 active individuals identified on the APPS list as currently armed and prohibited in California.  ER476.  A total of 34,689 handguns and 1,441 assault weapons were associated with these individuals.  *Id.*

As mentioned above, California's DROS system operates to prevent the sale or transfer of a firearm when a licensed firearms dealer submits a request for a background check for a prohibited person.  DOJ uses the APPS list to conduct enforcement actions that result in the seizure of firearms in the possession of prohibited persons.  ER241.  DOJ's Bureau of Firearms has approximately 58 peace officers who are dedicated to APPS enforcement.  ER474.  In the past approximately three years, these agents have conducted more than 13,000 APPS cases, resulting in the seizure of more than 8,000 firearms.  ER474–475.   DOJ's APPS program is the only one of its kind in the United States.  ER361.

## C.   California Senate Bill 819

The APPS program went into effect around 2006, at which time APPS was funded through moneys appropriated from the General Fund.  But with the passage of Senate Bill 819 in 2011, the Legislature clarified that the APPS program could be funded with the DROS fees deposited into the Dealer's Record of Sale Special Account.  *See* Assem. Com. on Appropriations, Analysis of Senate Bill No. 819 (2011–2012 Reg. Sess.) July 16, 2011; Sen. Com. on Public Safety, Analysis of Senate Bill No. 819 (2011–2012 Reg. Sess.) April 26, 2011; ER258 & 264.[4]  As the Legislative Counsel's digest explained at the time:

> Existing law authorizes the Department of Justice to require a firearms dealer to charge each firearm purchaser a fee, as specified, to fund various specified costs in connection with, among other things, a background check of the purchaser, and to fund the costs associated with the department's firearms-related regulatory and enforcement activities related to the sale, purchase, loan, or transfer of firearms.  The bill would make related legislative findings and declarations.

---

[4] The legislative history cited here appears at SER023 and SER026. "Under Rule 201 of the Federal Rules of Evidence, the court may take judicial notice of the records of state courts [and] the legislative history of state statutes."  *Louis v. McCormick & Schmick Restaurant Corp.*, 460 F. Supp. 2d 1153, 1155 n.4 (C.D. Cal. 2006).

> This bill would also authorize using those charges to fund the
> department's firearms-related regulatory and enforcement
> activities related to the possession of firearms, as specified.

Cal. Senate Bill 819 (Leno), Stats. 2011, 743 (Leg. Counsel's digest).[5]

Thus, with SB 819 the Legislature amended the DROS fee statute (i.e.,

section 28225) to include the costs of enforcement activities related to

firearms possession. To explain further, prior to SB 819 the relevant

provision of section 28225 provided that the DROS fee shall be no more

than is necessary to fund DOJ for, among other things:

> [T]he costs associated with funding Department of Justice
> firearms-related regulatory and enforcement activities related to
> the sale, purchase, loan, or transfer of firearms pursuant to any
> provision listed in Section 16580.

§ 28225(b)(11). As a result of SB 819, the provision now states that the

DROS fee shall be no more than is necessary to fund DOJ for:

---

[5] This Legislative Counsel's digest appears at SER009. "Although
the Legislative Counsel's summary digests are not binding, they are entitled
to great weight." *Van Horn v. Watson*, 45 Cal. 4th 322, 332 n.11 (2008);
*accord Jones v. Lodge at Torrey Pines Partnership*, 42 Cal. 4th 1158, 1170
(2008). The Legislative Counsel's digest "constitutes the official summary
of the legal effect of the bill and is relied upon by the Legislature throughout
the legislative process," and thus "is recognized as a primary indication of
legislative intent." *Souvannarath v. Hadden*, 95 Cal. App. 4th 1115, 1126
n.9 (2002).

> [T]he costs associated with funding Department of Justice
> firearms-related regulatory and enforcement activities related to
> the sale, purchase, *possession*, loan, or transfer of firearms
> pursuant to any provision listed in Section 16580.

§ 28225(b)(11) (emphasis added).

Finally, while such provisions were not impacted by SB 819,
section 28225 also provides that the DROS fee is designed to fund DOJ "for
the cost of furnishing this information," "for the cost of meeting" certain
firearms notification obligations under the Welfare and Institutions Code,
and "for the costs associated with" certain firearms public education and
notification programs. *See* § 28225(b)(1), (2), (10), & (11). Still other
aspects of the statute provide that section 28225 is designed to cover certain
firearms-related costs incurred by mental health facilities, hospitals, local
law enforcement agencies, and other state departments. *See* § 28225(b)(3)–
(9).

### D.    California Senate Bill 140

In 2013, the Legislature passed Senate Bill 140, a bill appropriating
$24 million from the DROS Special Account to DOJ to address a growing
backlog in APPS cases. In relevant part, the Legislature made the following
findings and declarations:

(c) Each day, the list of armed prohibited persons in California grows by about 15 to 20 people. There are currently more than 20,000 armed prohibited persons in California. Collectively, these individuals are believed to be in possession of over 39,000 handguns and 1,670 assault weapons.

(d) Neither the Department of Justice nor local law enforcement has sufficient resources to confiscate the enormous backlog of weapons, nor can they keep up with the daily influx of newly prohibited persons.

(e) It is the intent of the Legislature in enacting this measure to allow the Department of Justice to utilize additional Dealers' Record of Sale Special Account funds for the limited purpose of addressing the current APPS backlog and the illegal possession of these firearms, which presents a substantial danger to public safety.

Cal. Senate Bill 140 (Leno), Stats. 2013, ch. 2, § 1.

Thus, the Legislature added to the California Penal Code

section 30015, which provides, in relevant part:

The sum of twenty-four million dollars ($24,000,000) is hereby appropriated from the Dealers' Record of Sale Special Account of the General Fund to the Department of Justice to address the backlog in the Armed Prohibited Persons System (APPS) and the illegal possession of firearms by those prohibited persons.

§ 30015(a). The Legislature passed SB 140 as an urgency statute "necessary

for the immediate preservation of the public peace, health, or safety," and

the law went into "immediate effect." Cal. Senate Bill 140 (Leno), Stats.

2013, ch. 2, § 3.

## II. PROCEDURAL HISTORY

### A. Plaintiffs File Suit Challenging Defendants' Expenditure of DROS Fee Revenues.

Plaintiffs initiated this action for declaratory and injunctive relief under 42 U.S.C. section 1983 by filing a complaint on August 25, 2011. ER503. They filed a first amended complaint on February 9, 2012. ER504.

The California Legislature's passage of Senate Bill 140 was a development in state law that materially affected the nature of Plaintiffs' case. Accordingly, on July 24, 2013, Plaintiffs filed a second amended complaint, which is the operative pleading in this case. ER507.

Plaintiffs served a significant amount of written discovery, to which Defendants responded. SER040. Plaintiffs also took the deposition of Defendant Stephen Lindley, a transcript of which is included in the record before the district court. *Id*.

### B. The Parties

#### 1. Defendants

There are two defendants. The lead defendant is Kamala D. Harris, the Attorney General of the State of California. ER491. The Attorney General is sued in her official capacity only. *Id*.

The other defendant is Stephen Lindley, Chief of the California Department of Justice Bureau of Firearms.  ER492.  Lindley is also sued in his official capacity only.  *Id.*

The Attorney General and Lindley are generally responsible for the enforcement of a number of state laws regarding the manufacture, sale, purchase, ownership, possession, loan, and transfer of firearms.  ER491–492.  These include the laws related to DROS and APPS.  *Id.*

### 2. Plaintiffs

The plaintiffs include two organizations, four individuals, and a firearms dealer.  ER488–491.

The organizational plaintiffs are two gun rights advocacy groups, the National Rifle Association (NRA) and the California Rifle and Pistol Association Foundation, Inc. (CRPA).  ER489–490.

The individual plaintiffs are Barry Bauer, Stephen Warkentin, Jeffrey Hacker, and Nicole Ferry.  ER488–489.   Within the last five years, each has purchased multiple firearms and paid the DROS fee applicable to each of those transactions.  *Id.*

Finally, the plaintiffs include a firearms dealer, Herb Bauer Sporting Goods, Inc.  ER490–491.  As a dealer, Herb Bauer Sporting Goods collects DROS fees as required by the laws applicable to firearms transactions.  *Id.*

14

## C. Plaintiffs' Claim

Plaintiffs are pursuing a single claim for relief concerning "defendants' use of DROS fee revenues."  ER498.  According to the second amended complaint, Plaintiffs take issue with Defendants' use of those revenues "to fund general law enforcement activities not reasonably related to regulating the behavior or impact on the state of the fee payers."  *Id.*  Such use, Plaintiffs maintain, violates their "right to acquire firearms as guaranteed by the Second and Fourteenth Amendments."  *Id.*

In particular, Plaintiffs challenge Defendants' "use of the revenues generated from the DROS Fee for general law enforcement activities which have no relation to fee payers; specifically, activities associated with the DOJ's Armed Prohibited Persons System program provided for by California Penal Code section 28225(b)(11)."  ER486.  According to the second amended complaint, the "use of revenues generated from the DROS Fee to fund general law enforcement activities associated with the DOJ's APPS program is unconstitutional, because the criminal misuse of firearms is not sufficiently related to the fee payers' activities, i.e., lawful firearm transactions."  ER488.

In their second amended complaint, Plaintiffs have also been careful to explain what they are not challenging.  Specifically, Plaintiffs do not

challenge "the legality of imposing the DROS Fee in the first place." ER496. Nor do they challenge the legality "of the APPS System" itself. *Id*. Plaintiffs also disavow any claim that "the current DROS fee is excessive." ER487. Finally, Plaintiffs do not claim that the DROS fee imposes an unconstitutional burden on the actual exercise of their Second Amendment rights. In other words, this is not a case where Plaintiffs were unable to pay the DROS fee or take possession of firearms. Plaintiffs allege that they have paid the DROS fee on the relevant occasions and have taken possession of the related firearms. ER488–489.

Thus, Plaintiffs request for relief in the district court was narrow. They sought a declaration that the "enforcement of the APPS program is not sufficiently related to Plaintiffs' lawful firearm purchases so as to justify Defendants using the revenues from the DROS Fee . . . for the purpose of funding the APPS program." ER498. They asked the district court to declare that such use of DROS fee revenues violates Plaintiffs' Second Amendment rights "because it improperly requires Plaintiffs to bear the burden of financing general law enforcement activities as a precondition to exercising those rights." *Id*. Related, Plaintiffs sought an "injunction forbidding defendants . . . from using DROS Fee revenues to fund the APPS program." ER499.

**D. The District Court Grants Defendants' Motion for Summary Judgment, Rejecting Plaintiffs' Second Amendment Claim**

In the court below, this matter was resolved by way of cross-motions for summary judgment. The parties fully briefed the matter, and the court found it appropriate to rule on the motions without oral argument. ER002. In a written Memorandum Decision and Order issued on March 2, 2015, the Honorable Lawrence J. O'Neill rejected Plaintiffs' Second Amendment claim and upheld Defendants' use of DROS fee revenues. ER001.

The district court followed the two-step approach adopted by this Court in *Chovan*, and subsequently employed in *Jackson*. The court accurately summarized that the approach involves (1) asking whether the challenged law burdens conduct protected by the Second Amendment and (2) if so, applying an appropriate level of heightened scrutiny. ER006.

At step one of the Second Amendment inquiry, the district court explained, in sum, that the DROS fee is a condition on the commercial sale of firearms and is therefore one of the "presumptively lawful regulatory measures" recognized by the Supreme Court in *Heller*. 554 U.S. at 627 n.26. Thus, the court concluded that the DROS fee does not burden Plaintiffs' Second Amendment rights. ER008. More specifically, the court

found that the "DROS fee is constitutional because it 'falls outside the historical scope of the Second Amendment.'" *Id*.

Even though it found no burden on the Second Amendment, the court went on to recognize at step two of the relevant inquiry that "the DROS fee imposes only a $19.00 fee on firearm transactions." ER008–009. Thus, "[u]nder any level of scrutiny, the DROS fee is constitutional because it places only a marginal burden on 'the core of the Second Amendment,' which is 'the right of law-abiding, responsible citizens to use arms in defense of hearth and home.' [Citation.]." *Id*.

Finally, the district court expressly declined to assess Plaintiffs' Second Amendment claim under any applicable "fee jurisprudence" in the First Amendment context. As the court explained in a footnote, "because the Ninth Circuit has not indicated that First Amendment precedent concerning whether and to what extent a state may impose a fee as a precondition to exercising a constitutional right is appropriate in the Second Amendment context, the Court declines to apply that precedent here." ER009.

Accordingly, the district court found "that Defendants' use of the DROS fee to fund the APPS does not violate the Second Amendment." ER009. The court therefore entered judgment in favor of Defendants, and Plaintiffs initiated this appeal.

## SUMMARY OF THE ARGUMENT

The district court correctly decided this case. The DROS fee does not burden any Second Amendment rights of Plaintiffs. Even if it did, the DROS fee survives intermediate scrutiny. Assuming this Court reaches the issue, which it need not to resolve this appeal, the DROS fee also withstands review under the Supreme Court's "fee jurisprudence" developed in the context of the First Amendment. Thus, Defendants' expenditure of DROS fee revenues on the APPS program does not violate the Second Amendment.

## STANDARD OF REVIEW

This Court reviews de novo a district court's decision on cross-motions for summary judgment. *Children's Hosp. Med. Ctr. v. California Nurses Ass'n*, 283 F.3d 1188, 1191 (9th Cir. 2002). Its review "is governed by the same standard used by the trial court under Federal Rule of Civil Procedure 56(c)." *Adcock v. Chrysler Corp.*, 166 F.3d 1290, 1292 (9th Cir. 1999). The Court "must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the substantive law." *Id.*

# ARGUMENT

## I. DEFENDANTS' USE OF DROS FEE REVENUES TO FUND THE APPS PROGRAM DOES NOT VIOLATE THE SECOND AMENDMENT

### A. The Second Amendment and the Supreme Court's decisions in *Heller* and *McDonald*

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.

In *Heller*, the Supreme Court undertook a thorough analysis of the Second Amendment.  In that case, a District of Columbia special police officer sued to invalidate a District law completely banning the possession of a handgun in the home and requiring that any other lawfully owned firearm in the home, such as a registered long gun, be disassembled or otherwise rendered inoperable for immediate use.  554 U.S. at 574.

The Court held that the Second Amendment protects an individual right, not a collective one: "There seems to us no doubt, on the basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms."  *Heller*, 554 U.S. at 595.  But critically, in what has become well-known and often-cited language, the Court further held that "[l]ike most rights, the right secured by the Second Amendment is not unlimited.  From Blackstone through the 19th-century cases, commentators

and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id*. at 626 (citations omitted). Thus, while *Heller* did uphold the invalidation of a very strict law of the District of Columbia that generally prohibited the possession of handguns, *id*. at 576, 636, *Heller* took care to provide an expressly non-exhaustive list of "presumptively lawful regulatory measures," *id*. at 627 n.26 – "a variety of tools" that "the Constitution leaves . . . for combating" the problem of firearm violence in the United States. *Id*. at 636. That list includes "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id*. at 626–27.

Key to *Heller*'s analysis of the District's regulations was the observation that "the law totally bans handgun possession in the home. It also requires that any lawful firearm in the home be disassembled or bound by a trigger lock at all times, rendering it inoperable." *Heller*, 554 U.S. at 628. In finding the total ban on handguns unconstitutional, the Court explained:

> [T]he inherent right of self-defense has been central to the Second Amendment right. The handgun ban amounts to a prohibition of an entire class of "arms" that is overwhelmingly chosen by American society for that lawful purpose. The prohibition extends, moreover, to the home, where the need for defense of self, family, and property is most acute. Under any of the standards of scrutiny that we have applied to enumerated constitutional rights, banning from the home "the most preferred firearm in the nation to 'keep' and use for protection of one's home and family," would fail constitutional muster.

*Id*. at 628–29 (footnote and citation omitted). Addressing the requirement that firearms in the home be rendered and kept inoperable at all times, the Court similarly explained that the requirement was unconstitutional because "[t]his makes it impossible for citizens to use them for the core lawful purpose of self-defense[.]" *Id*. at 630.

Because the District's law was unconstitutional under any level of constitutional scrutiny, *Heller* declined to indicate precisely what standard of review would apply to Second Amendment challenges. *Id*. at 628 n.27. Nor did *Heller* reach the issue of whether the Second Amendment is incorporated by the Fourteenth Amendment and therefore applicable to the States, *id*. at 620 n.23, although the Court would later address that issue in *McDonald v. City of Chicago*, 561 U.S. 742 (2010).

In *McDonald*, the Supreme Court held that the Second Amendment is fully incorporated against the States via the Fourteenth Amendment. 561

U.S. at 777–78.  Yet the Court explained that "incorporation does not

imperil every law regulating firearms."  *Id*. at 786.  In doing so, the Court

was careful to re-state the critical language from *Heller*:

> It is important to keep in mind that *Heller*, while striking down
> a law that prohibited the possession of handguns in the home,
> recognized that the right to keep and bear arms is not "a right to
> keep and carry any weapon whatsoever in any manner
> whatsoever and for whatever purpose."  [Citation.]  We made it
> clear in Heller that our holding did not cast doubt on such
> longstanding regulatory measures as "prohibitions on the
> possession of firearms by felons and the mentally ill," "laws
> forbidding the carrying of firearms in sensitive places such as
> schools and government buildings, *or laws imposing conditions
> and qualifications on the commercial sale of arms*."  [Citation.]
> We repeat those assurances here.

*Id*. (italics added).  In *McDonald*, the Court also declined to address the

applicable standard of review, leaving the lower courts to grapple with the

question of the standard to apply to laws that arguably implicate the Second

Amendment.

## B.  The Two-Step Inquiry Applicable to Second Amendment Challenges in the Ninth Circuit

In *Chovan*, this Court held that a specific two-step analytical

framework applies to Second Amendment challenges.  After considering the

approach of other circuits, the Court decided to "adopt the two-step Second

Amendment inquiry undertaken by the Third Circuit in [*United States v.

Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010)], and the Fourth Circuit in

[*United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010)], among other circuits." *Chovan*, 735 F.3d at 1136.

The two-step Second Amendment inquiry "(1) asks whether the challenged law burdens conduct protected by the Second Amendment and (2) if so, directs courts to apply an appropriate level of scrutiny." *Chovan*, 735 F.3d at 1136. The Court explained that "this two-step inquiry reflects the Supreme Court's holding in *Heller* that, while the Second Amendment protects an individual right to keep and bear arms, the scope of that right is not unlimited." *Id.* (citing *Heller*, 554 U.S. at 626–27). The Court also explained that the two-step inquiry is "consistent with the approach taken by other circuits considering various firearms restrictions post-Heller." *Id.* (citing cases); *see also Jackson*, 746 F.3d at 960 (applying two-step inquiry and upholding San Francisco regulations governing handgun storage and prohibiting certain ammunition sales).

As explained below, Defendants' use of DROS fee revenues on the APPS program does not burden any conduct protected by the Second Amendment. Thus, this Court, like the district court, should end its analysis at step one of the inquiry. But even if this Court were to engage in step two of the inquiry, Defendants' use of DROS fee revenues would survive constitutional scrutiny.

### 1. Step One: There Is No Burden on Plaintiffs' Second Amendment Rights.

As indicated above, Plaintiffs are only challenging Defendants' *expenditure* of DROS fee revenues. Plaintiffs expressly disavow any challenge to the amount of the DROS fee or the fact that a fee is imposed in the first place. ER487 & 496. Similarly, Plaintiffs do not seek a declaration invalidating the DROS fee statute. ER498–499. They seek only declaratory and injunctive relief regarding the *use* of DROS fee revenues. Accordingly, at the threshold, the district court correctly concluded that the DROS fee falls outside the scope of the Second Amendment, and therefore that Defendants' use of DROS fee revenues does not burden Plaintiffs' Second Amendment rights.

More specifically, the district court correctly concluded that section 28225 is like those firearms regulations specifically endorsed by the Supreme Court in *Heller* because they do not burden the Second Amendment right. On its face section 28225 is a "law[] imposing conditions and qualifications on the commercial sale of arms," and therefore "presumptively lawful." *Heller*, 554 U.S. at 626–27; *see also United States v. Vongxay*, 594 F.3d 1111, 1115 (9th Cir. 2010) (upholding federal felon-in-possession statute because it is "presumptively lawful").

Section 28225 is also similar to the $340 residential handgun license fee statute upheld in *Kwong v. Bloomberg*, 723 F.3d 160 (2d Cir. 2013) *cert. denied sub nom. Kwong v. de Blasio*, 134 S. Ct. 2696 (2014).  In *Kwong*, the Second Circuit found "it difficult to say that the licensing fee, which amounts to just over $100 per year, is anything more than a 'marginal, incremental or even appreciable restraint' on one's Second Amendment rights especially considering that Plaintiffs have put forth no evidence to support their position that the fee is prohibitively expensive."  723 F.3d at 167.

In *Kwong*, each plaintiff was able to, and did, obtain a residential handgun license.  *Id*. at 167 n.14.  A similar situation exists here.  Plaintiffs remain free to lawfully purchase and possess firearms.  Indeed, there is no allegation or evidence to the contrary.  For example, Plaintiffs do not claim that they cannot afford the DROS fee or were somehow unable to possess firearms because of the DROS fee.  Rather, Plaintiffs concede that each of them has purchased and taken possession of multiple firearms within the past five years and paid the DROS fee applicable to each of those

transactions. [6]  ER488–489.  These facts show that Defendants' use of DROS fees simply does not burden "'the right of law-abiding, responsible citizens to use arms in defense of hearth and home.'"  *Chovan*, 735 F.3d at 1138 (quoting *Heller*, 554 U.S. at 635).

Accordingly, the district court correctly found that Defendants' expenditure of DROS fee revenues on the APPS program does not burden Plaintiffs' Second Amendment rights.  Therefore, this Court should end its analysis at step one of the applicable two-step inquiry.

### 2. Step Two: The DROS Fee Survives Constitutional Scrutiny

#### a. Intermediate scrutiny applies

If the Court finds that the DROS fee burdens Second Amendment rights and proceeds to step two, the level of scrutiny is determined by "(1) 'how close the law comes to the core of the Second Amendment right,' and (2) 'the severity of the law's burden on the right.'" *Chovan*, 735 F.3d at 1138 (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 703 (7th Cir. 2011)). "Intermediate scrutiny is appropriate if the regulation at issue does not

---

[6] Indeed, the number of yearly firearms purchase transactions in California continues to climb.  In 2010, there were 498,945 DROS transactions for handguns and long guns.  By 2014, that number had nearly doubled to 931,037.  ER035.

implicate the core Second Amendment right *or* does not place a substantial burden on that right." *Fyock v. Sunnyvale*, 779 F.3d 991, 998–99 (9th Cir. 2015)(emphasis in original).

The DROS fee does not implicate the core of the Second Amendment. It does not concern possession and use of firearms generally, much less possession and use in the home. *See Heller*, 554 U.S. at 635 (core of Second Amendment is "the right of law-abiding, responsible citizens to use arms in defense of hearth and home"). Nor does the $19 fee substantially burden the Second Amendment right. Unlike the circumstances in *Chovan*, for example, it does not prohibit a class of people from using or possessing firearms for life. On the contrary, and as discussed above, there is no indication whatsoever that Plaintiffs cannot afford the DROS fee or are unable to possess firearms because of the fee. Under the current law, Plaintiffs have already bought and own multiple firearms. Thus, even if the DROS fee imposed some burden on Second Amendment rights, at most intermediate scrutiny applies. *See Chovan*, 735 F.3d at 1138 (directing courts to apply "an *appropriate* level of scrutiny" if challenged law burdens Second Amendment) (italics added).

Finally, Plaintiffs briefly argue for the application of strict scrutiny. But no court in this circuit has required the application of strict scrutiny to a

firearms regulation. And as the discussion in *Chovan* demonstrates, the overwhelming majority of Second Amendment cases post-Heller have rejected strict scrutiny. *See Chovan*, 735 F.3d at 1134–36; *see also Jackson*, 965 F.3d at 965 (applying intermediate scrutiny). Also, as the *Heller* dissent and others have noted, *Heller*'s list of presumptively lawful regulatory measures is itself inconsistent with strict scrutiny. *See Heller*, 554 U.S. at 688 (Breyer, J., dissenting) ("the majority implicitly, and appropriately, reject[ed]" a strict scrutiny standard through its list of presumptively lawful regulatory measures).

### b. The expenditure of DROS fee revenues on the APPS program reasonably advances important public interests

Under intermediate scrutiny, the Legislature's decision to fund the APPS program with DROS fee revenues advances the interests of improving public safety by disarming individuals who are prohibited from owning or possessing firearms because of their criminal history, a restraining order, or mental illness. Courts have consistently recognized these to be significant, substantial, and important government interests. And they have done so in the context of considering challenges to gun laws. *See*, *e.g.*, *Jackson*, 746 F.3d 965–66 ("reducing the number of gun-related injuries and deaths" is significant government interest); *Kwong*, 723 F.3d at 168 (2d Cir. 2013)

29

("governmental interests in public safety and crime prevention" are "substantial, indeed compelling"); *United States v. Skoien*, 614 F.3d 638, 642 (7th Cir. 2010) ("preventing armed mayhem" is "an important governmental objective").

Next, the text of section 28225(b)(11) shows that there is a "reasonable fit" between these interests and the use of DROS fee revenues on the APPS program. *Chovan*, 735 F.3d at 1139 (acknowledging that courts have used various terminology to describe applicable standard, but "all forms of the standard require (1) the government's stated objective to be significant, substantial, or important; and (2) a reasonable fit between the challenged regulation and the asserted objective").[7] The statutory language expressly provides that the DROS fee is intended "to fund," among other things, "costs associated with funding Department of Justice firearms-related regulatory and enforcement activities related to the sale, purchase, possession, loan, or transfer of firearms pursuant to any provision listed in Section 16580." § 28225(b)(11). Fundamentally, the APPS program in fact concerns the

---

[7] Plaintiffs wrongly focus on the relationship, or fit, between the use of DROS fee revenues on the APPS program and DROS fee payers. The relationship to be examined is the one between the use of the DROS fees on the APPS program and the interests of reducing crime and preventing firearms violence, not the actual conduct of each and every DROS fee payer. Again, Plaintiffs do not challenge the legality of the DROS fee itself.

investigation of individuals who are armed and prohibited from possessing firearms and law enforcement's recovery of such firearms. *See* §§ 30000–30015.

The legislative history of SB 819 also shows a "reasonable fit" between the use of DROS fee revenues and the interests of improving public safety by reducing firearm violence and reducing crime. The author of SB 819 specifically intended "to clarify that [DOJ] may use existing department resources to help enforce the APPS to keep guns out of the hands of the more than 18,000 persons who are on California's Prohibited Armed Persons File due to mental illness, felony convictions, or gun-related convictions." Assem. Com. on Appropriations, Analysis of Senate Bill No. 819 (2011–2012 Reg. Sess.) July 16, 2011 at 2. A Senate committee report similarly states that SB 819 "would clarify that DOJ is permitted to use DROS funds to pay for its efforts to retrieve unlawfully possessed firearms and prosecute individuals who possess those firearms despite being prohibited by law from doing so." Sen. Com. on Public Safety, Analysis of Senate Bill No. 819 (2011–2012 Reg. Sess.) April 26, 2011 at 11.

An explanation of SB 819 by its author of SB 819 also demonstrates the requisite fit between the use of DROS fee revenues on the APPS program and the important interests at stake:

It is in everyone's interest to ensure that firearms are not in the possession of prohibited persons. However, law-abiding firearms owners have a particularly strong interest in this to help avoid gun ownership from becoming strongly associated with the random acts of deranged individuals. Moreover, the purpose of the bill is to strengthen enforcement of existing guns laws. A prospective gun owner pays a fee to determine whether he or she is eligible to purchase a gun (background check), it makes sense that the fee should apply to enforcement when those same individuals become "ineligible" due to criminal behavior or mental illness. Accordingly, there is a very close nexus between the DROS fund and the bill's intended purpose. Moreover, the bill is aligned with gun advocates' stated interest in heightened enforcement of existing gun laws and the alternative would be to place this additional burden on the tax payer at large.

Assem. Com. on Appropriations, Analysis of Senate Bill No. 819 (2011–2012 Reg. Sess.) July 16, 2011 at 2; *see* Turner Broad. Sys., Inc. v. FCC, 520 U.S. 180, 195 (1997) ("When reviewing the constitutionality of statutes, courts 'accord substantial deference to the [legislature's] predictive judgments.'").

Common sense also establishes a link between the interests identified above and the use of DROS fee revenues on the APPS program. Specifically, where fee revenues are used, in part, to ensure that people desiring to possess firearms in California are not legally prohibited from possessing them, it only makes sense to use that fee to fund the recovery of firearms from persons who become prohibited from possessing them.

For these reasons, even if the Court were to reach step two in the applicable two-step analysis, Defendants' use of DROS fee revenues survives intermediate scrutiny:  there is a reasonable fit between the expenditure of those revenues on the APPS program and the important government interests of improving public safety by reducing firearm violence and crime.  This Court should affirm the judgment of the district court.

## II.  DEFENDANTS' USE OF DROS FEE REVENUES TO FUND THE APPS PROGRAM IS ALSO CONSTITUTIONAL UNDER THE APPLICABLE "FEE JURISPRUDENCE"

As stated above, in its discretion the district court declined to assess whether the DROS fee impermissibly burdens Plaintiffs' Second Amendment rights under the Supreme Court's "fee jurisprudence."  That line of cases generally concerns the constitutionality of fees charged on expressive activities protected by the First Amendment, and as the court below recognized, the Ninth Circuit has yet to determine whether those First Amendment cases provide an appropriate foundation for addressing fee claims under the Second Amendment.  It is not necessary to make such a determination in this case.  But even if this Court were to do so, the $19 DROS fee would still pass constitutional muster.

In the First Amendment context the Supreme Court held more than sixty years ago that governmental entities may impose licensing fees relating to the exercise of constitutional rights when the fees are designed "to meet the expense incident to the administration of the [licensing statute] and to the *maintenance of public order in the matter licensed*." *Cox v. New Hampshire*, 312 U.S. 569, 577 (1941) (italics added and quotation marks omitted). In *Cox*, the Court upheld a provision in a New Hampshire statute, for the licensing of parades and processions, establishing a range of fees from a nominal amount to $300. 312 U.S. at 576.

In *Murdock v. Pennsylvania*, 319 U.S. 105 (1943), the Court invalidated a flat license fee levied on distributors of religious literature. Distinguishing the case from *Cox*, the Court stated: "And the fee is not a nominal one, imposed as a regulatory measure and calculated to defray the expense of protecting those on the streets and at home against the abuses of solicitors." 319 U.S. at 116. Elsewhere the Court characterized the fee as "not a nominal fee imposed as a regulatory measure to defray the expenses of *policing the activities in question*." *Id*. at 113–14 (italics added).

The First Amendment case law in the Ninth Circuit also indicates that there is nothing unconstitutional about imposing a fee on the exercise of a constitutional right when the fee is designed to defray the broader

administrative costs of regulating the protected activity. In *Southern Oregon Barter Fair v. Jackson County, Oregon*, 372 F.3d 1128, 1139 (9th Cir. 2004), the court explained that "[a] state may . . . impose a permit fee that is reasonably related to legitimate content-neutral considerations, such as the cost of administering the ordinance, the cost of public services for an event of a particular size, or the cost of special facilities required for the event."

Another circuit has stated the following: "The lesson to be gleaned from *Cox* and *Murdock* is that an ordinance requiring a person to pay a license or permit fee before he can engage in a constitutionally protected activity does not violate the Constitution so long as the purpose of charging the fee is limited to defraying *expenses incurred in furtherance of a legitimate state interest.*" *Ne. Ohio Coal. for the Homeless v. City of Cleveland*, 105 F.3d 1107, 1109–10 (6th Cir. 1997) (italics added). Yet another circuit has recognized that the calculation of costs incident to a permit or licensing scheme may include both the administrative costs *and the enforcement costs* "necessary to ensure that the purposes of [the regulatory scheme] are served." *Nat'l Awareness Foundation v. Abrams*, 50 F.3d 1159, 1166 (2d Cir. 1995) (upholding fee for professional fundraising where fee calculations included salaries and fringe benefits of those enforcing regulatory scheme and building-related expenses); *see also*

*Stonewall Union v. City of Columbus*, 931 F.2d 1130, 1136–37 (6th Cir. 1991) (city may use the "full cost" accounting methodology in determining the fee for parade permit).

Since *Heller* and *McDonald*, the courts that have used the First Amendment framework in considering the constitutionality of charging fees in connection with the exercise of Second Amendment rights have upheld those fees. As referenced above, the Second Circuit upheld a $340 fee to obtain a residential handgun license in New York City. *Kwong*, 723 F.3d at 161. Applying the framework articulated by the Supreme Court in *Cox*, the Second Circuit found that "[t]he undisputed evidence presented to the District Court demonstrates that the $340 licensing fee is designed to defray (and does not exceed) the administrative costs associated with the licensing scheme." 723 F.3d at 166. The court therefore held that the district court correctly concluded that the city ordinance at issue imposed a constitutionally permissible "fee." *Id*. at 167.

In *Justice v. Town of Cicero*, 827 F. Supp. 2d 835, 837, 841 (N.D. Ill. 2011), the plaintiff challenged a city ordinance's firearms registration requirement and its imposition of a $25 nonrefundable registration fee. The court upheld the fee, finding that it was intended to defray costs associated with registration and explaining that "there is no indication that the [city's]

fee was imposed for any other purpose." *Id.* at 842. Like the fee in *Cox*, the firearms registration fee in *Cicero* "'take[s] into account the greater public expense' and is 'not a revenue tax, but one to meet the expense incident to the administration of the act and to the maintenance of public order in the matter licensed. There is nothing contrary to the Constitution in the charge of a fee limited to the purpose stated.'" *Id.* (quoting *Cox*, 312 U.S. at 577).

Finally, on remand in the *Heller* litigation, the district court upheld similar registration fees enacted by the Council of the District of Columbia, the legislative branch of the local government there. Relying on a legislative committee report in the record, the court reasoned that the fee provisions of the Act were constitutional because they were intended to compensate the District for the costs associated with registration, including "fingerprinting registrants, . . . processing applications and maintaining a database of firearms owners." *Heller v. District of Columbia*, 698 F. Supp. 2d 179, 192 (D.D.C. 2010), *rev'd in part on other grounds*, 670 F.3d 1244 (D.C. Cir. 2011).

Here, the record demonstrates that the $19 DROS fee is designed to defray DOJ's costs associated with enforcing a variety of California's

firearm laws, including but not limited to the laws related to APPS.[8]  Again,

the language of the statute itself states that the DROS fee is intended to fund,

among other things, "costs associated with funding Department of Justice

firearms-related regulatory and enforcement activities related to the sale,

purchase, possession, loan, or transfer of firearms pursuant to any provision

listed in Section 16580." § 28225(b)(11).  The legislative history discussed

above shows the direct connection between the DROS fee and the APPS

program.  *See* Assem. Com. on Appropriations, Analysis of Senate Bill No.

819 (2011–2012 Reg. Sess.) July 16, 2011 at 2; Sen. Com. on Public Safety,

Analysis of Senate Bill No. 819 (2011–2012 Reg. Sess.) April 26, 2011 at

11; Assem. Com. on Appropriations, Analysis of Senate Bill No. 819 (2011–

2012 Reg. Sess.) July 16, 2011 at 2.  And there is the practical connection

between the payment of a fee which is used, in part, to ensure that people

desiring to possess firearms in California are not legally prohibited from

---

[8] In a heading in their brief, Plaintiffs assert, but do not seriously
argue, that the DROS fee must be "revenue neutral" to be constitutional.
Appellants' Opening Brief (AOB) at 25.  However, *Cox* and *Murdock* do not
speak in such terms.  Nor does any case in the Ninth Circuit.  Moreover,
whether the DROS fee is revenue neutral goes to the amount of the $19 fee,
and the second amended complaint expressly alleged that this case does not
involve whether the current DROS fee "is excessive, in violation of state and
federal law."  ER487.  Thus, there is no "revenue neutral" issue for this
Court to resolve.

possessing them, and the use of that fee to recover firearms from persons who become prohibited from possessing them.

Finally, the law simply does not support Plaintiffs' assertion that charging a fee in connection with a constitutionally protected activity is permissible only if the fee is intended to defray some narrow category of "administrative" costs, which, Plaintiffs argue, cannot include enforcement costs.[9] *Cox* and *Murdock* recognize a much broader rule. More specifically, phrased in terms of *Cox*, the required inquiry in this case is whether Defendants are using DROS fee revenues to meet not just the expenses incident to the administration of section 28225, but also the expenses incident to "to the maintenance of public order in the matter licensed." 312 U.S. at 577. In this case, the "matter licensed" is "firearms-related regulatory and enforcement activities related to the sale, purchase, possession, loan, or transfer of firearms." § 28225(b)(11). Phrased another way, and in terms of *Murdock*, this Court would ask under this analysis whether Defendants are using DROS fees "to defray the expenses of policing the activities in question," 319 U.S. at 113–14, with the "activities

---

[9] According to Plaintiffs, such administrative costs are limited to the costs of "running a background check, processing the requisite paperwork, and recording the transaction," for example. *See* AOB at 1.

in question" being "firearms-related regulatory and enforcement activities related to the sale, purchase, possession, loan, or transfer of firearms." § 28225(b)(11).  It is undisputed that this broad language encompasses the APPS program, which involves law enforcement's recovery of firearms from persons prohibited from possessing them due to criminal behavior or mental illness.[10]  And California certainly has a legitimate state interest in reducing firearm violence and crime by disarming such individuals.

Accordingly, like the fees upheld in *Kwong*, *Cicero*, and *Heller*, the $19 DROS fee "take[s] into account the greater public expense" and is "not a revenue tax, but one to meet the expense incident to the administration of the act and to the maintenance of public order in the matter licensed.  There is nothing contrary to the Constitution in the charge of a fee limited to the purpose stated."  *Cox*, 312 U.S. at 577 (internal quotations and citation omitted).  For these reasons as well, the $19 DROS fee does not run afoul of the Second Amendment.

---

[10] It is worth noting that the DROS fee statute expressly lists *ten* other categories of costs that the fee covers.  *See* Cal. Penal Code § 28225(b)(1)–(10).  Plaintiffs expressly do not challenge those costs.  SER042–043. ("Penal Code sections 28225(b)(1)–(10) and 28230 authorize the Department to use revenues from the DROS Fee to fund various activities, none of which are challenged here.").

# CONCLUSION

This Court should affirm the district court's judgment.

Dated: October 15, 2015        Respectfully submitted,

KAMALA D. HARRIS
Attorney General of California
DOUGLAS J. WOODS
Senior Assistant Attorney General
STEPAN A. HAYTAYAN
Supervising Deputy Attorney General

*s/ ANTHONY R. HAKL*

ANTHONY R. HAKL
Deputy Attorney General
*Attorneys for Defendants Firearms Bureau*

SA2015102108
APPELLEES ANSWERING BRIEF.doc

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**BARRY BAUER, STEPHEN WARKENTIN, NICOLE FERRY, LELAND ADLEY, JEFFREY HACKER, NATIONAL RIFLE ASSOCIATION OF AMERICA, INC., CALIFORNIA RIFLE PISTOL ASSOCIATION FOUNDATION, HERB BAUER SPORTING GOODS, INC.,**

Plaintiffs,

**v.**

**KAMALA HARRIS, in Her Official Capacity as Attorney General For the State of California; STEPHEN LINDLEY, in His Official Capacity as Acting chief for the California Department of Justice, and DOES 1-10,**

Defendants.

**STATEMENT OF RELATED CASES**

To the best of our knowledge, there are no related cases.

Dated:  October 15, 2015         Respectfully Submitted,

KAMALA D. HARRIS
Attorney General of California
DOUGLAS J. WOODS
Senior Assistant Attorney General
STEPAN A. HAYTAYAN
Supervising Deputy Attorney General

*s/ ANTHONY R. HAKL*

ANTHONY R. HAKL
Deputy Attorney General
*Attorneys for Defendants Firearms Bureau*

# CERTIFICATE OF COMPLIANCE
## PURSUANT TO FED.R.APP.P 32(a)(7)(C) AND CIRCUIT RULE 32-1
## FOR 15-15428

I certify that:  (check (x) appropriate option(s))

**[X]**   1.  Pursuant to Fed.R.App.P. 32(a)(7)(C) and Ninth Circuit Rule 32-1, the attached **opening/answering/reply/cross-appeal** brief is

    **[X]**   Proportionately spaced, has a typeface of 14 points or more and contains 8,034 words (opening, answering and the second and third briefs filed in cross-appeals must not exceed 14,000 words; reply briefs must not exceed 7,000 words

or is

    **[ ]**   Monospaced, has 10.5 or fewer characters per inch and contains _____ words or ____ lines of text (opening, answering, and the second and third briefs filed in cross-appeals must not exceed 14,000 words or 1,300 lines of text; reply briefs must not exceed 7,000 words or 650 lines of text).

**[ ]**   2.  The attached brief is **not** subject to the type-volume limitations of Fed.R.App.P. 32(a7)(B) because

    **[ ]**   This brief complies with Fed.R.App.P 32(a)(1)-(7) and is a principal brief of no more than 30 pages or a reply brief of no more than 15 pages.

or

    **[ ]**   This brief complies with a page or size-volume limitation established by separate court order dated _____ and is

    **[ ]**   Proportionately spaced, has a typeface of 14 points or more and contains _____ words,

or is

    **[ ]**   Monospaced, has 10.5 or fewer characters per inch and contains ___ pages or ___ words or ___ lines of text.

**[ ]**   3.  Briefs in **Capital Cases**.
This brief is being filed in a capital case pursuant to the type-volume limitations set forth at Circuit Rule 32-4 and is

    **[ ]**   Proportionately spaced, has a typeface of 14 points or more and contains _____ words (opening, answering and the second and third briefs filed in cross-appeals must not exceed 21,000 words; reply briefs must not exceed 9,800 words).

or is

    **[ ]**   Monospaced, has 10.5 or fewer characters per inch and contains ___ words or ___ lines of text (opening, answering, and the second and third briefs filed in cross-appeals must not exceed 75 pages or 1,950 lines of text; reply briefs must not exceed 35 pages or 910 lines of text).

☐ 4. **Amicus Briefs**.

☐ Pursuant to Fed.R.App.P 29(d) and 9th Cir.R. 32-1, the attached amicus brief is proportionally spaced, has a typeface of 14 points or more and contains 7,000 words or less,

or is

☐ Monospaced, has 10.5 or few characters per inch and contains not more than either 7,000 words or 650 lines of text,

or is

☐ Not subject to the type-volume limitations because it is an amicus brief of no more than 15 pages and complies with Fed.R.App.P. 32 (a)(1)(5).

| | |
|---|---|
| October 15, 2015 | *s/ Anthony R. Hakl* |
| Dated | Anthony R. Hakl<br>Deputy Attorney General |

# CERTIFICATE OF SERVICE

Case Name: **Bauer, Barry et al. v. Kamala D.**    No.   **15-15428**
             **Harris, et al. (APPEAL)**

I hereby certify that on <u>October 15, 2015</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**APPELLEES' ANSWERING BRIEF**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on <u>October 15, 2015</u>, at Sacramento, California.

<table>
<tr><td>Tracie L. Campbell</td><td>s/ Tracie Campbell</td></tr>
<tr><td>Declarant</td><td>Signature</td></tr>
</table>

SA2015102108
12017776.doc